# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs March 7, 2006

## STATE OF TENNESSEE v. HAROLD D. NOEL

**Direct Appeal from the Criminal Court for Shelby County**
**No. 03-01160     James C. Beasley, Judge**

---

### No. W2005-00160-CCA-R3-CD  - Filed September 25, 2006

---

The defendant, Harold D. Noel, was convicted of voluntary manslaughter. See Tenn. Code Ann. § 39-13-211 (2003). The trial court imposed a sentence of six years to be served in the Department of Correction. In this appeal, the defendant asserts that the trial court erred by denying his motion to suppress. The judgment of the trial court is affirmed.

**Tenn. R. App. P. 3; Judgment of the Trial Court Affirmed**

GARY R. WADE, P.J., delivered the opinion of the court, in which JOSEPH M. TIPTON and NORMA MCGEE OGLE, JJ., joined.

Jeffrey Jones, Bartlett, Tennessee, for the appellant, Harold Noel.

Paul G. Summers, Attorney General & Reporter; Renee W. Turner, Assistant Attorney General; William L. Gibbons, District Attorney General; and Paul Goodman, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

At approximately 8:15 a.m. on June 21, 2002, prominent Memphis attorney Robert Friedman was shot and killed in the parking garage of his office building. Witnesses reported seeing a well-dressed black male in his late twenties to early forties run from the crime scene to a blue Toyota Corolla. When the defendant became a suspect during the course of the investigation, officers drove to his place of residence to question him. The defendant declined to cooperate with the officers and, for several hours, refused to open the door to his apartment. Eventually, the defendant opened the locked door and was immediately handcuffed and taken to the police station. After several hours of questioning, the defendant admitted his involvement in the shooting.

The defendant was charged with first degree murder. After a pretrial hearing, the trial court denied a motion to suppress a confession the defendant had made to the police. At the conclusion of the ensuing trial, which lasted six days, the jury returned a verdict on the lesser included offense

of voluntary manslaughter. Later, the trial court imposed a sentence of six years in the Department of Correction.

In this appeal of right, the defendant asserts his arrest was unlawful and complains that the trial court erred by denying the motion to suppress his pre-trial statement to police. He specifically contends that the statement qualifies as tainted by his unlawful arrest.

At the hearing on the motion, Memphis Police Captain James Crawford testified that at the time of the offense he was working the night shift. He recalled that just after he returned home on the morning after the offense, a police dispatcher telephoned to inform him that the defendant wanted to speak to him. According to Captain Crawford, he had become acquainted with the defendant several years earlier because they had used the same maintenance man for their rental properties. After learning that the defendant was wanted for questioning in relation to the shooting of Attorney Friedman and had refused to leave his apartment, Captain Crawford telephoned the defendant, who stated that he was "very, very concerned" about the presence of the police officers outside his apartment; and told Captain Crawford that he was "afraid he might be injured." According to the police captain, he assured the defendant that he would not be hurt and advised him that "the best way to remedy that situation [was] to talk with the officers and cooperate with them one hundred percent." He recalled that the defendant "appeared to calm some" and eventually agreed to meet with the police. Captain Crawford testified that he then telephoned the officers at the scene to let them know that the defendant had consented to cooperate and re-contacted the defendant to inform him that the officers would be waiting for him outside.

During cross-examination, Captain Crawford acknowledged that the defendant had been told by the officers that they wanted to question him about illegal drug sales from his apartment. The police captain testified that it was his understanding that the officers' purpose was to place the defendant under arrest. He stated that during his three-way conversation with the defendant and Lieutenant Williams, he heard the defendant open the door to his apartment and step outside where he was arrested.

Sergeant James Fitzpatrick, who was the case coordinator, testified that he initially became involved in the case when he was dispatched to the scene of the shooting, which took place on the fourth floor of the parking garage of the 100 North Main Building. Sergeant Fitzpatrick recalled that after interviewing several witnesses, officers developed a description of the suspect as "a six-foot male black who was [wearing a] dark colored dress suit with a . . . manila folder in his hand." A witness had seen a man matching that description drive away in a dark blue, 2002 Toyota Corolla. A videotape from a security camera on the outside of the Morgan Keegan building confirmed that the suspect entered the vehicle and drove west on Front Street.

According to Sergeant Fitzpatrick, a local attorney had seen the suspect driving along Front Street and the attorney's companion had recorded the license number of the dark blue vehicle. A license tag check established that the car was owned by Enterprise Rent-A-Car. Sergeant Fitzpatrick stated that he contacted Enterprise and learned that the defendant had rented the car ten days earlier

and had returned it just over an hour after the shooting. The rental agreement contained the defendant's address and telephone number. That evening, Sergeant Fitzpatrick dispatched two detectives to the defendant's residence to ask him to come to the police station for questioning. When Sergeant Fitzpatrick learned that the defendant would not permit entry to his residence and refused to cooperate, he sent uniformed officers to assist.

During cross-examination, Sergeant Fitzpatrick conceded that after the defendant was taken into custody, a search of the his residence had failed to yield a weapon or any clothing matching the description of that worn by the perpetrator. He also acknowledged that he did not find anything at the defendant's apartment which related to the shooting. Sergeant Fitzpatrick testified that while he did not specifically direct the arrest of the defendant, he sent the detectives to the defendant's residence "to bring [him] in so that [they] could question him." Sergeant Fitzpatrick had learned that the witnesses at the scene had given conflicting descriptions of the suspect and recalled that each of them had described an individual younger than the age of the defendant. He also acknowledged that because the quality was so poor, officers were unable to identify the defendant from the security tape from the Morgan Keegan building. He agreed that the primary lead he had was that the defendant had returned a rental car which witnesses had identified as having been driven by the perpetrator. Sergeant Fitzpatrick testified that he personally did not believe he had probable cause to arrest the defendant at the time he dispatched the detectives to the defendant's residence. It was his recollection that the detectives were to simply ask the defendant "to come in to address the matter of who had the possession of the [rental] vehicle on . . . that morning." According to Sergeant Fitzpatrick, the uniformed officers were sent to maintain the scene outside the defendant's apartment "to find out exactly who [was] inside and . . . what the reason [was] that they [would] not respond to our . . . knocks at the door."

Sergeant Joe Stark, a detective assigned to the robbery unit, testified that he and Detective Mark Berryman drove to the defendant's residence accompanied by two uniformed patrol officers to seek his cooperation in the investigation of the shooting. Sergeant Stark recalled that when they arrived at the residence, he and Detective Berryman knocked on the door and identified themselves. According to Sergeant Stark, he saw an individual "peek[] out" between the blinds of a window near the door and exclaim, "[O]h, shit." When he knocked on the door a second time and asked the occupant to come to the door, he received no response. Sergeant Stark testified that at the time he left the residence approximately one hour later, the defendant had not responded to the officer's request for entry.

During cross-examination, Sergeant Stark admitted that he and Detective Berryman intended to take the defendant into custody regardless of whether he agreed to come in for questioning. He acknowledged that he and the other officers had "banged" on the defendant's door approximately every five minutes and had shined their flashlights into the windows of the apartment.

Lieutenant Henry Williams of the Vice Unit, who was summoned to the apartment to try to make contact with the defendant, recalled that the defendant first inquired why the officers were there. He testified that when he explained to the defendant that the officers had received a complaint

of drug activity at the residence, the defendant refused to leave his residence and said, "I don't sell drugs here." He testified that the defendant then asked, "[Y]ou sure this is not about that shooting that happened at the garage?" Lieutenant Williams responded, "[N]o sir, it's not about a shooting that happened at the garage." He described the conversation as "very calm." Lieutenant Williams emphasized that his only information was to "try to get [the defendant] to come down . . . to give them a statement about his part in renting this vehicle that was seen leaving the area of downtown after this shooting." He stated that he was not aware at the time that he arrived that the defendant was a homicide suspect, explaining, "Because if I had knowledge of that, then I would have questioned my immediate supervisor why . . . are we going instead of a TACT Unit or somebody that's trained in a situation like this." Lieutenant Williams also testified that at one point the defendant indicated a willingness to open the door to his apartment but expressed fear that he would be beaten by the white officers who were present. He stated that when he assured the defendant that he would not be hurt and after Captain Crawford assisted in the matter, the defendant quietly and mannerly came out with his hands raised. According to Lieutenant Williams, the defendant authorized a search of his residence but no incriminating evidence was discovered. The officer testified that he then transported the defendant to the police station and, at the direction of Lieutenant Norris, took him to an interview room.

During cross-examination, Lieutenant Williams confirmed that he had been instructed by his superiors to bring in the defendant for questioning. He acknowledged that although he arrived at the apartment at approximately 8:30 p.m., the defendant was not taken into custody until between 4:00 and 5:00 a.m., over eight hours after their arrival. He confirmed that he was accompanied to the residence by five other officers. Lieutenant Williams acknowledged that he did not intend to question the defendant or perform any other type of investigation. He admitted that the defendant was not free to leave his apartment except to surrender to police and conceded that if the defendant had attempted to leave the residence, he would have been detained "until somebody from the Homicide Squad made it to the scene to talk to this guy." The officer described his statement about illegal drug sales as a ruse and explained, "[T]hat was the . . . simplest thing for us to talk about to keep it on a calm situation." Lieutenant Williams recalled that at the time of the arrest, there were six police officers in all at the defendant's residence, three stationed at the back door and another three at the front. He denied having told the defendant that they had a search warrant or having threatened to kick the door in if he did not cooperate. All of the officers admittedly had their weapons drawn when the defendant finally emerged from the apartment. Lieutenant Williams conceded that he did not inform the defendant of his Miranda rights or tell him that he had the right to refuse to cooperate.

Sergeant William Ashton, who interviewed the defendant after his arrest, testified that the defendant was informed of his Miranda rights and had expressed an understanding of those rights but had refused to sign the waiver of rights form. According to Sergeant Ashton, the defendant told the officers that "from watching TV, he knew not to sign anything, but that he . . . would talk to us." He testified that the defendant gave "a full confession . . . of everything that happened from the beginning to end," admitting having shot the victim and explaining why he had done so. According to to Sergeant Ashton, he was unaware of the events at the defendant's apartment when he conducted

the interview. It was his opinion that the defendant was not under the influence of drugs or alcohol or otherwise confused at the time. He described the defendant as "laughing, real giddy, kind of bouncing in his chair." Although the defendant was shackled to the table during at least a portion of the interview, Sergeant Ashton nevertheless maintained that the defendant was not initially under arrest. The statement was transcribed and typed for the defendant to initial and sign. The defendant's statement was not recorded on either audiotape or videotape.

At the conclusion of the interview, the following questions and answers were documented:

Q: Did you give this statement freely and voluntarily without any threats, promises or coercion?

A: Yes sir.

Q: While you have been in the Homicide Office at 201 Poplar today, Saturday, June 22, 2002, have all your needs of food, water and restroom breaks been granted to you?

A: Yes sir, y'all have been good to me.

Q: I'm going to ask you to read your nine page statement and if you find it to be true and correct, place your initials in the bottom right-hand corner of the first eight pages and place your signature, date and time on the last page in the space provided. Do you understand?

A: Yes sir.

During the hearing, the forty-nine-year-old defendant testified that it was approximately 11:00 p.m. when he first became aware that officers were outside his apartment. He confirmed that the officers had asked him to open the door so that they could talk to him about a drug complaint and claimed that when he refused to let them inside, one of the officers announced that they had a warrant to search the residence. He contended that he asked the officer to slide the search warrant under the door but the officer did not do so. According to the defendant, he spoke with that officer for approximately thirty to forty minutes before saying, "[S]how me a search warrant and . . . I'll let you in. But other than that, I ain't coming back to the door. Why don't you leave. I'm fixing to go to sleep." The defendant claimed that the officer responded, "[I]f we can't get no sleep, you don't get no sleep." He asserted that he then went to the kitchen and drank a beer while the police continued "bamming on the door." The defendant claimed that he called the dispatcher at two different precincts in an attempt to ascertain why the police were at his residence. He stated that shortly after his calls, the officers cut the cable to his television.

The defendant recalled that at that point, a lieutenant demanded entry and promised to get a search warrant. According to the defendant, the lieutenant returned to the door approximately twenty minutes later, again demanded entry, and threatened to kick the door in if he refused to comply. The defendant testified that he eventually telephoned Captain Crawford and left several messages at his residence. He stated that when Captain Crawford returned his call, he promised to find out what was going on and call him back. The defendant recalled that Captain Crawford telephoned back approximately fifteen minutes later, informed him that the officers only wanted to

talk to him, and urged him to let them inside. The defendant confirmed that he eventually participated in a three-way telephone conversation with Captain Crawford and Lieutenant Williams and agreed to permit the officers inside upon Lieutenant Williams's promise that he would not be injured. The defendant claimed that as he opened the latch, the officers "pushed the door on open," placed handcuffs on him and "put [him] on [his] knees" in the living room. According to the defendant, the officers "stormed" in with their guns drawn and began to search the apartment. The defendant testified that Lieutenant Williams drove him to the police station where he was shackled to a table until Sergeant Ashton took him into an interview room. He claimed that his repeated requests to speak to his lawyer were ignored and insisted that Sergeant Ashton told him that he "didn't need a lawyer." According to the defendant, he was held in the room for "hours" without food, water, or a restroom break.

During cross-examination, the defendant contended that he was not advised of his Miranda rights and was not shown the "Advice of Rights" form. He denied giving the statement that was entered into evidence, claiming that it had been "changed and altered." While he conceded that he had placed his initials beside the questions and answers on the typewritten statement, he claimed that some of the answers were inserted after he had initialed the document.

The trial court denied the motion to suppress, ruling that the officers had probable cause to arrest the defendant when he exited his apartment. The court made the following observations:

> While [the police] were at [the defendant's] apartment the actions of [the defendant], his original comment when the police were there, his subsequent statement[,] "Are you sure you're not here about the shooting at the garage?" when there had been no indication about anything like that, this [c]ourt is of the opinion that more than sufficient probable cause existed for [the defendant] to be arrested and detained for these charges. . . . The [c]ourt finds and believes based on the law that it has reviewed that this did amount to probable cause to arrest and detain [the defendant].
>
> If that is the case then the [c]ourt sees no issue with regard to the warrantless entry into [the defendant's] residence. And it would appear to the [c]ourt that there was no basic entry into [the defendant's] residence. The testimony was that [the defendant] opened the door. Stepped outside. And I think the testimony was that while he was on the phone with the captain, his friend from the Memphis Police Department, he did all of this. And the captain testified he was able to hear all of this. And there did not appear to be any issues that he had detected over the phone. Lieutenant Williams indicated that [the defendant] came outside voluntarily and was cuffed and detained at that point.

The trial court also determined that the defendant's statement was freely and voluntarily given, after he had been fully advised of his rights:

And the testimony that was presented by the officers was that approximately 9:00 . . . or 9:09 I believe they had advised [the defendant] of his rights. They read the rights to him. Had him read the first few lines back and gave him the form. He went over the form. According to . . . Ashton, . . . [the defendant] acknowledged that he understood his rights however he refused to sign the advice of rights form based on some stuff he had seen on television. But he did agree that he understood his rights and he began talking about the case with the officers. . . .

The trial court observed that the statement provided by the defendant was very detailed and commented, "The point I'm drawing is it gives the [c]ourt an indication that [the defendant] was in full control of his mental faculties."

In the ensuing trial, the confession was admitted into evidence. The defendant had been represented by the victim in a divorce case that included a custody issue regarding his daughter. He admitted that he had waited in the parking garage for the victim and stated that his plan was "[t]o shoot him for the cruel way he betrayed me in representing me." He described himself as in a state of despair because he had lost everything, including a place to live, in the divorce. The defendant acknowledged that he shot the victim four times with a .38 revolver from a distance of four feet. He also stated that he "wanted to kill Chancellor Alissandratos but I didn't figure I had enough time . . . ." He told officers that he then drove to his apartment, changed clothes, and returned his rental car.

In this appeal, the defendant asserts that the trial court erred by denying his motion to suppress the statement he provided to police. He contends that the statement was the direct result of his illegal, warrantless arrest and, therefore, inadmissible as evidence. The state submits that the defendant's arrest was based upon probable cause and that the statement was freely and voluntarily given.

The standard of review applicable to suppression issues is well established. When the trial court makes a finding of facts at the conclusion of a suppression hearing, the facts are accorded the weight of a jury verdict. State v. Stephenson, 878 S.W.2d 530, 544 (Tenn. 1994). The trial court's findings are binding upon this court unless the evidence in the record preponderates against them. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996); see also Stephenson, 878 S.W.2d at 544; State v. Goforth, 678 S.W.2d 477, 479 (Tenn. Crim. App. 1984). Questions of credibility of witnesses, the weight and value of the evidence and resolution of conflicts in evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence. Odom, 928 S.W.2d at 23. This court's review of a trial court's application of law to the facts, however, is conducted under a de novo standard of review. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001); State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999).

Both the Fourth Amendment to the United States Constitution and Article I, section 7 of the Tennessee Constitution prohibit unreasonable searches and seizures. See U.S. Const. amend. IV

("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . .); Tenn. Const. art. I, § 7 ("That the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures . . . ."). The purpose of these provisions is to "'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" State v. Randolph, 74 S.W.3d 330, 334 (Tenn. 2002) (quoting Camara v. Mun. Court, 387 U.S. 523, 528 (1967)).

The defendant first asserts that his arrest was illegal because the officers arrested him inside his home without a warrant. In Payton v. New York, 445 U.S. 573 (1980), the United States Supreme Court confirmed that warrantless searches and seizures inside a home are presumptively unreasonable, ruling that "[i]n terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." Id. at 590. Our supreme court has observed that "'Payton did not draw the line one or two feet into the home; it drew the line at the home's entrance.'" State v. Clark, 844 S.W.2d 597, 599 (Tenn. 1992) (quoting United States v. Berkowitz, 927 F.2d 1376, 1388 (7th Cir.1991)). This court has ruled that "[i]f a resident within the home consents to police entry, however, a warrant is not required." State v. Wilson, 990 S.W.2d 726, 730 (Tenn. Crim. App. 1998) (citing United States v. Matlock, 415 U.S. 164 (1974); Clark, 844 S.W.2d at 599).

Here, the trial court accredited the testimony of Lieutenant Williams that the defendant was handcuffed only after he had walked out of his apartment with his arms raised. The trial court ruled that the defendant's claim that the officers rushed into his residence, handcuffed him, and placed him on the ground was not credible. Because deference must be afforded to the factual assessment of the trial court that the police did not enter the defendant's residence to place him under arrest, the ruling in Payton would not be applicable and the warrantless arrest of the defendant would not be per se unreasonable. See Payton, 445 U.S. at 590.

The defendant also contends that he was seized before he was placed in the actual physical custody of the officers and that the seizure was not based upon probable cause. Our courts have recognized three types of police-citizen interactions: (1) a full scale arrest, which must be supported by probable cause; (2) a brief investigatory stop, which must be supported by reasonable suspicion; and (3) a brief police-citizen encounter, which requires no objective justification. See Florida v. Bostick, 501 U.S. 429, 434 (1991); Brown v. Illinois, 422 U.S. 590, 602 (1975); Terry v. Ohio, 392 U.S. 1, 20-27 (1968). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." Terry, 392 U.S. at 19 n.16. Our supreme court has concluded that "'a "seizure" implicating constitutional concerns occurs only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave.'" Randolph, 74 S.W.3d at 336 (quoting State v. Daniel, 12 S.W.3d 420, 425 (Tenn. 2000)). In Crutcher, the high court defined the most invasive of police-citizen encounters, a full-scale arrest:

In Tennessee, an arrest is more specifically defined as "the taking, seizing, or detaining of the person of another, either by touching or putting hands on him, or by any act which indicates an intention to take him into custody and subjects the person arrested to the actual control and will of the person making the arrest." An arrest may be affected without formal words or a station house booking. However, there must be actual restraint on the arrestee's freedom of movement under legal authority of the arresting officer.

989 S.W.2d at 301-02 (citations omitted).

Here, several officers arrived at the defendant's apartment sometime after 8:30 p.m., knocked on the door, and asked the defendant for permission to enter. The defendant initially refused to answer. Later, when Lieutenant Williams arrived and informed the defendant that the officers were there to investigate a drug complaint, the defendant responded by stating that he did not sell drugs. He refused to open the door and claimed that he informed the officers that he would only allow entry if they showed him a search warrant. Lieutenant Williams, who had positioned officers at both exits of the defendant's residence and had repeatedly asked the defendant to accompany him to the police station, acknowledged that the officers had their weapons drawn. Notwithstanding the testimony of Sergeant Fitzgerald that, in his view, the police lacked probable cause at the time he dispatched the detective to the apartment of the defendant, Lieutenant Williams conceded that the defendant was not free to leave the residence and admitted that the defendant was going to be placed in custody as soon as he walked outside of the apartment. The defendant subjectively believed that while he was free to move about inside his residence, he was not free to leave.[1] Under all of these circumstances and the various testimony of the witnesses, it is our view that the defendant was subject to "'a "seizure" implicating constitutional concerns,'" Randolph, 74 S.W.3d at 336 (quoting State v. Daniel, 12 S.W.3d at 425), when the officers who had surrounded his residence developed the intention to take him into custody for questioning. At that point, "'in view of all the circumstances surrounding the incident, a reasonable person would [not] have believed that he or she was not free to leave.'" Id.

In consequence, our next inquiry is whether the seizure amounted to a full-scale arrest or a less invasive investigative detention. As indicated, our supreme court has stated that an arrest occurs when there is an "actual restraint on the arrestee's freedom of movement under legal authority of the arresting officer." Crutcher, 989 S.W.2d at 301-02. Although the defendant was not in the actual physical control of the officers until he stepped out of his apartment, his residence remained surrounded by officers. Using the terminology of Crutcher, there was a restraint on his freedom of movement. Thus, the defendant was under arrest at some point prior to his opening the apartment

---

[1] Cases from the United States Supreme Court have established that "an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." Devenpeck v. Alford, 543 U.S. 146, 153 (2004) (citing Whren v. United States, 517 U.S. 806, 812-13 (1996); Arkansas v. Sullivan, 532 U.S. 769, 771-72 (2001)). "[The] subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." Id.

door. The trial court, accrediting the testimony of Lieutenant Williams, reached that same conclusion.

Because the defendant was arrested without a warrant, the next inquiry is whether the arrest was supported by probable cause. Probable cause has been defined as follows:

> [W]hether at [the] moment [of arrest] the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed . . . an offense.

Beck v. Ohio, 379 U.S. 89, 91 (1964). Tennessee Code Annotated section 40-7-103 provides that "[a]n officer may, without a warrant, arrest a person . . . [w]hen a felony has in fact been committed, and the officer has reasonable cause for believing the person arrested to have committed it." Tenn. Code Ann. § 40-7-103(3) (2003). Our courts have made little, if any, distinction between the terms "reasonable cause" and "probable cause" in determining whether there exists a basis for an arrest. See, e.g., State v. Melson, 638 S.W.2d 342 (Tenn. 1982), cert. denied, 459 U.S. 1137 (1983). In 1975, our supreme court stated that "[i]n dealing with probable cause, one deals with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." State v. Jefferson, 529 S.W.2d 674, 689 (Tenn. 1975) (citing Draper v. United States, 358 U.S. 307 (1959)). Generally, the subjective motivations and characterizations by the police are not determinative as to the legitimacy of an arrest, search, or seizure. Whren, 517 U.S. at 812-13; State v. Vineyard, 958 S.W.2d 730, 736 (Tenn. 1997); State v. Johnson, 980 S.W.2d 414, 423 (Tenn. Crim. App. 1998). Article I, section 7, does not afford any greater protection than that afforded by the Fourth Amendment to the United States Constitution. Vineyard, 958 S.W.2d at 731. In Whren, the United States Supreme Court unanimously rejected the notion that the constitutional reasonableness of an arrest depends upon the knowledge or motivation of the individuals involved. 517 U.S. at 812-13.

Here, the testimony at the hearing on the motion to suppress established that several witnesses observed a well-dressed black male in his late twenties to early forties run from the parking garage where the victim was shot. The perpetrator eventually drove away in a dark blue, 2002 Toyota Corolla. A videotape from Morgan Keegan, while of poor quality, confirmed that a suspect had run to a Toyota and fled the scene. Another witness observed the same car being driven erratically and wrote down the license plate number of the vehicle. Officers traced the vehicle to Enterprise Rent-A-Car and learned that the defendant, a forty-eight-year-old black male, had rented the car before the shooting and returned it only an hour and a half thereafter. At that point, officers traveled to the defendant's residence to question him about his possession of the vehicle and its relationship to the crime. The officers conceded that they did not know at that time whether the defendant matched the physical description of the suspect. Upon their arrival, at least one of the officers observed the occupant of the residence "peek out" of the front window and express his disappointment by the use of a vulgar term. While at the defendant's residence, the officers had several brief exchanges with the defendant, informing him that they were investigating a complaint

-10-

of drugs being sold at the residence. Although the defendant denied selling drugs, he incriminated himself when he inquired whether the officers were there to investigate the shooting at the parking garage. There was no explanation as to how he would have otherwise known of the incident or might have suspected that the officers were there for that purpose. The trial court accredited the testimony of Lieutenant Williams that none of the officers had previously mentioned the shooting to the defendant.

In our view, these facts established probable cause to arrest the defendant. Because the defendant's arrest was based upon probable cause, the fruit of the poisonous tree doctrine does not bar the admission into evidence of the statement that was taken following the arrest. See Wong Sun v. United States, 371 U.S. 471, 485 (1963).

Even if the statement had been tainted by an illegal arrest, it is not always inadmissible. In order to determine whether a statement obtained after a Fourth Amendment violation must be suppressed, the first inquiry is whether the incriminating statement is "sufficiently an act of free will to purge the primary taint of the unlawful invasion." Id. at 486. In State v. Huddleston, 924 S.W.2d 666 (Tenn. 1996), our supreme court identified four factors as pertinent to the analysis of whether the illegal arrest had been attenuated by the circumstances:

> (1) the presence or absence of Miranda warnings; (2) the temporal proximity of the arrest and the confession; (3) the presence of intervening circumstances; and finally, of particular significance, (4) the purpose and flagrancy of the official misconduct.

Id. at 674. Under these circumstances, however, where the arrest is based upon probable cause, that analysis is unnecessary. The circumstances which warranted the arrest here are similar to those in Patten v. State, 426 S.W.2d 503 (Tenn 1967). The basis for the arrest were the following facts:

> (1) A witness saw the defendant and a companion run from the liquor store, get into a light 1955 Ford and drive down Old Saint Elmo Avenue; (2) the police were able to track a 1955 Ford to the defendant's motel by tracks made by the car as it was driven through some water-filled chuck holes on Old Saint Elmo Avenue; (3) when the car was located, the hood was warm, indicating that it had been driven very recently; and (4) the officers obtained the name of the owner from the desk clerk and proceeded to the motel room to make the arrest.

426 S.W.2d at 506. In Patten, the arrest was upheld and an incidental search yielded incriminating evidence. In the case at issue, there was also probable cause to arrest. The defendant's inquiry as to whether the detectives were there in relation to the shooting of the victim was of particular importance. Thus, the confession was properly admitted as evidence.

Accordingly, the judgment of the trial court is affirmed.

_____
GARY R. WADE, PRESIDING JUDGE